[No. H016564. Sixth Dist. Oct. 2, 1998.]

EDWARD M. WALSH, as Trustee in Bankruptcy, etc., Plaintiff and Appellant, v.
WEST VALLEY MISSION COMMUNITY COLLEGE DISTRICT, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II, sections B, C and D.

**COUNSEL**

Malcolm A. Misuraca and Julian J. Hubbard for Plaintiff and Appellant.

Low, Ball & Lynch, Chester G. Moore III and Janet Kulig for Defendant and Respondent.

**OPINION**

**COTTLE, P. J.**—Sergio Construction, Inc. (SCI) entered into a contract with West Valley Mission Community College District (District) to build a gymnasium on the college campus. The contract called for the gymnasium to be completed within one year. When that time elapsed and the gymnasium was not complete, the District terminated SCI's contract. As a result, SCI brought this action against the District for breach of contract; the District in turn filed a cross-complaint against SCI.[1]

The District's cross-complaint was subsequently settled by SCI's insurer and SCI's bonding company, and the District filed a dismissal of the

---

[1] For the sake of simplicity, we shall not list the other parties who were named as defendants or cross-defendants in the complaint and cross-complaint. All have been dismissed as a result of settlements and are not a part of this appeal. Nor shall we enumerate the numerous actions filed against SCI by subcontractors and materials providers. All were resolved prior to trial and are also not a part of this appeal. After suit was filed in this case, SCI filed for bankruptcy. As a result, Edward M. Walsh, SCI's trustee in bankruptcy, was substituted in as plaintiff in place of SCI. For purposes of clarity, we shall refer to SCI and Walsh collectively as SCI.

cross-complaint with prejudice. At trial, SCI moved for judgment on the pleadings, arguing that the District's dismissal of its cross-complaint acted as a retraxit which precluded the District from contesting any of SCI's allegations in the trial. The trial court denied the motion, and following a month-long trial, the jury returned a general verdict in favor of the District. Subsequently, the trial court granted the District its attorney fees of approximately $600,000. On appeal, SCI contends the trial court erred in denying its motion for judgment on the pleadings, in granting attorney fees to the District, and in denying its motion for judgment notwithstanding the verdict. For reasons we shall explain, we affirm the judgment.

## I. FACTS

SCI, as the low bidder, was awarded the contract to build a gymnasium on one of the District's campuses. On July 29, 1992, the parties signed a formal agreement, consisting of a 19-page American Institute of Architects (AIA) standard form No. A201 (1976 ed.), along with 16 pages of supplemental conditions. The agreement called for SCI to build the gymnasium by August 3, 1993, for the sum of $3,176,200.

The building of the gymnasium was subject to the provisions of California Code of Regulations, titles 21 and 24, as it involved a public school. Those regulations require that school buildings "be designed to resist earthquake forces generated by major earthquakes of the intensity and severity of the strongest experienced in California without catastrophic collapse . . . ." (Cal. Code Regs., tit. 21, § 1.) The Office of State Architect (OSA) is responsible for enforcing titles 21 and 24. (Cal. Code Regs., tit. 21, § 3.) All plans and specifications for school buildings must be submitted to OSA for approval. (Cal. Code Regs., tit. 21, §§ 6-7; id., tit. 24, pt. 1, § 4-343.) The building standards themselves are set forth in title 24.

On August 10, 1993, a week after the gymnasium was supposed to have been completed under the contract, the District delivered an "order to expedite construction" to SCI. The order demanded that SCI prepare applicable shop drawings for the concrete slab on grade and vapor barrier, that it remove two inches of sand and that it pour the concrete by, at the latest, August 27, 1993. When that deadline passed, the District terminated SCI's contract on August 31, 1993.

The District's lengthy termination letter specified the following reasons for the termination: The project was only 50 percent complete, although the contract called for 100 percent completion by this date; the concrete slab on grade was improperly sequenced; the vapor barrier under the slab was

wrongfully used as a working surface, injuring the integrity of the membrane; SCI had not paid the floor supplier although the District had paid SCI for a wooden gymnasium floor; SCI did not provide an adequate number of workers on the jobsite; subcontractors had not been adequately coordinated; SCI had not demonstrated either the skill or willingness to timely and properly complete the contract or to follow and discharge the architect's plans and interpretations; SCI had failed to comply with the District's request to expedite construction; SCI's concrete slab on grade shop drawings were deficient; SCI had failed to appoint a competent project superintendent; and SCI had failed to complete the concrete slab by August 27, 1993.

After receiving the termination letter, SCI filed the instant action against the District and others on September 8, 1993. The complaint alleged nine causes of action, including one against the District for breach of contract.

On June 13, 1994, the District filed a cross-complaint against SCI, SCI's bonding company, and SCI's general liability insurer. The District's cross-complaint alleged that SCI failed to construct the gymnasium on time or in a good and workmanlike manner, that the District performed its obligations under the contract, and that it suffered damages and extra costs, including property damage, as a result of SCI's actions. The cross-complaint sought damages from SCI for indemnity, negligence, breach of warranty, and breach of contract, and sought damages from the bonding company for breach of a performance bond.

The District's cross-complaint was settled prior to trial by the American Insurance Company (TAIC), SCI's bonding company, and CNA Insurance Company (CNA), SCI's insurer. TAIC had issued a performance bond assuring the obligations of SCI under the contract. To settle the cross-complaint, TAIC agreed to fund a settlement offer to SCI or a judgment procured by SCI against the District, up to a maximum of $405,000. In addition, TAIC agreed to offset any judgment that SCI might obtain against the District by assigning its rights to a $1.4 million claim pending in SCI's bankruptcy action.

The other settling party, CNA, was not only SCI's insurer, it was also the District's insurer as a result of an endorsement on SCI's policy that identified the District as an "additional named insured." In full settlement of the District's property damage claims against SCI, CNA agreed to pay $210,000 to the District. It also agreed, as the District's insurer, to pay the District $150,000 on its first party (failure to defend and/or indemnify) bad faith claim.

Following the settlement, the District filed a dismissal of its cross-complaint with prejudice. Based on this dismissal, SCI filed a motion at the beginning of trial for summary judgment/judgment on the pleadings. The trial court denied SCI's motion and a month-long trial commenced on SCI's claim that the District had breached its contract, all other causes of action having been dismissed.

At trial, SCI attempted to prove that it was the District, not SCI, that had breached the parties' contract. That contract specified, inter alia, that "[a]ll minor changes in the work require Change Orders." SCI offered evidence that the District's retained architects, Kiyoshi Matsuo and Thomas Mistretta, repeatedly ordered changes in the job without processing the required change orders. Instead, they made the changes in "architect's supplemental instructions," or "ASI's." ASI's are standard AIA forms, which state, "The work shall be carried out in accordance with the following supplemental instructions issued in accordance with the contract documents without change in contract sum or contract time. Prior to proceeding in accordance with the instructions[,] indicate your acceptance of these instructions for minor change to the work as consistent with the contract documents and return a copy to the architect." During the course of construction, over 30 different ASI's were issued by the architects to SCI. On the other hand, only two change orders were issued.

A great deal of the testimony centered on exactly how minor these requested changes were. SCI contended they were not minor and that, in any event, even minor changes required change orders under the parties' contract. The District contended that the changes were insignificant and did not involve structural issues that were the concern of titles 21 and 24 of the California Code of Regulations, that the OSA had given preliminary approval to the changes, and that minor changes could be aggregated and later incorporated into change orders.

The focus of SCI's attention was on one particular ASI, ASI-2, which SCI contended required changes of major proportion. To demonstrate how significant these changes were, SCI prepared a computer animation for the jury. It showed how changing one measurement affected numerous other measurements.

ASI-2 was issued in the first week of the project. A structural steel subcontractor, who was drafting his first set of shop drawings, noted an 18-inch discrepancy between the architectural plans, which showed a column in one location and the structural plans, which showed the column in a

different location. The subcontractor went to Douglas Way, the project structural engineer, and asked for advice. Way studied the plans and then issued a letter moving two columns on the west wall. Way testified that the 18-inch change in location had no structural ramifications on the building and that it was simply a "dimensional clarification." Architect Matsuo concluded that no change order was required for this change as no structural or safety issues were involved.

SCI's expert, Raymond La Tona, however, testified that this change in column location set in motion changes in the building foundation, steel beams in the walls and roof, heating and air conditioning ducts and duct hangers, roof purlins, and lateral braces on the wall. A computer animation was shown to the jury highlighting all the changes.

The jury heard from numerous witnesses for the District who testified that the word "change" (necessitating a change order) does not include every deviation from the original plans and/or specifications.

Architect William Richardson, who testified as an expert witness, stated, "Change means a change in the scope of work. A change in the work that is specified or detailed, and would result in a modification of the contract, cost or time. That is what change means."

Richardson explained that "if an architect issues a supplemental instruction which clarifies a dimension, when two dimensions happen to be listed— use this one, not that one," such an instruction does not constitute a change in OSA parlance. Similarly, clarification drawings, shop drawings, and coordination drawings, unless they are included on a deferred approval list, are not required to be approved by OSA.

Richardson testified that the California Code of Regulations, title 21 language pertaining to change orders for minor changes dates back to the late 1970's. It soon became apparent that the requirement for a change order executed by contractor, architect, owner, and approved by OSA, was having the effect of bringing public works projects to a standstill. As a consequence, "OSA came up with the stamp, and the stamp meant this is formal, official approval of this change in your contract. We recognize that it may be a while before you can get an approved signed change order to process that everybody agrees to. So we are telling you, go ahead with your work. But some day subsequently you have to . . . come in here with a change order that has everybody's signature [on] it."

Architects of record have the responsibility to determine what modifications to contract documents require OSA review and approval. Richardson

also testified that except for issues pertaining to life safety, OSA is not particularly concerned when a change order is received by them which reflects merely a change in cost and/or time on the project.

Both project architects, Mistretta and Matsuo, testified similarly. Matsuo stated, "the state's architect's office . . . is concerned about three basic issues, the structural safety of a building, the life safety issues and accessibility. And they felt it was critical to have a line . . . on change orders so they could review any changes that occur. That they would never . . . expect[] that change that didn't affect these three issues would have to be [incorporated] into a change order unless it involved time or money."

There was no evidence presented that OSA objected to the manner in which the project was being managed or that it felt the District had not complied with titles 21 and 24 of the California Code of Regulations. The project's inspector of record (IOR), Bruce Tyson-Flynn, testified that to become an IOR, he had to be examined and licensed by the OSA. He had been an IOR on some 15 to 20 prior projects. IOR's are responsible for keeping, on the jobsite, a copy of every code mentioned in the contract documents, a record of all change orders and crew change orders, requests for information (RFI's), ASI's, and a current set of drawings and current codes. Typically, ASI's and clarification drawings are attached to the contract drawings, as well as annotations to RFI's.

*During the time the gymnasium was being constructed, representatives of OSA were on the project site a minimum of one time a month from September through May of 1993. A field engineer from the OSA visited the project nine times during construction. The engineer would examine the IOR's drawings and review them for updates; he would then physically inspect the project. If the engineer discovered a problem, he would issue a correction notice.*

Aside from the issue regarding ASI-2, the other topic that consumed a great deal of time at trial concerned the concrete slab and vapor barrier. SCI argued that it was terminated for refusing to proceed without a change order to install a concrete slab beneath the gymnasium floor. The design of the underlying vapor barrier had been changed twice by the architect by way of an ASI. SCI believed it was an unworkable design and might allow vapor to seep up and damage the wooden floor that was ultimately to be installed.

The District presented evidence that the concrete slab and vapor barrier were supposed to have been installed by November 16, 1992. It presented additional evidence that the reason changes in the vapor barrier design were

necessary was because SCI had deviated from the plans, making the original design impossible to carry out.

Matsuo testified that construction was to proceed in the following order: placement of piles, pouring of foundation, pouring of the slab on grade, steel framing, metal stud walls, roof, exterior walls, interior finishes, and finally installation of the wood floor.

For the slab to be poured, it was necessary to first install tie beams which would connect the two exterior walls. The tie beams, which were not even installed until April 6, 1993, were to be encased in the slab on grade. Also, before the slab could be poured, it was necessary that the electrical subcontractor have all of its conduit in place. Yet the electrical subcontractor was still installing under-slab conduit on April 6, 1993. The project was months behind schedule at that time, and the concrete slab had not yet been poured.

The project was not built as conceived. SCI elected to change the assembly sequence in which the project was to be completed. Instead of pouring the entire slab on grade by November 1992, SCI poured only the perimeter of the slab over the foundation so that they could install the metal studs and the perimeter wall. This change rendered it impossible to install the vapor barrier in the manner which had been detailed in the architectural plans. As Matsuo explained, "the reason this suggestion, this particular detail came up, is because Sergio Construction poured the bottom portion of the footing against the earth without thinking about how they were going to install the vapor barrier, which indicated the vapor barrier would go down the side of the footing."

Matsuo elucidated: "[SCI] decided to go ahead and install the parts of the building in a different manner than was outlined in the documents. [¶] As I stated earlier, they went ahead and poured the perimeter of this slab so they could proceed to install the metal studs in the perimeter walls. So when a contractor makes a substitution in terms or methods, it is his responsibility to come up with a solution which may have to be different from what was indicated in the original documents. [¶] So that is why you are correcting the slab. The detail was not agreed upon. But when this [August 1993] letter [to expedite construction] went out the conditions of the membrane details [were] not agreed upon. . . . [T]he conditions of installing that membrane [were] changed from what was shown on the document. That is why we expected [SCI] to come through with a detail on how they were going to install the membrane."

The installation of a vapor barrier, according to the District's construction expert, George Frank, is extremely simple. "[I]t doesn't take a scientist to

figure out how to make this work." In all of the projects that Frank had worked on that utilized this particular vapor barrier, he had never seen architectural details that specified every condition for the installation of the vapor barrier.

SCI's expert La Tona testified that the revised instructions regarding the vapor barrier, which were contained in ASI-20, were unworkable and failed to satisfy the requirements of the wood floor manufacturer. The jury returned its unanimous verdict for the District on November 27, 1996. Judgment was entered on the verdict on that date and notice of entry of judgment was filed on December 16, 1996.

Subsequently, SCI filed motions for judgment notwithstanding the verdict (JNOV) and new trial, and the District filed a motion for its attorney fees and costs. SCI filed a motion to tax costs. All four motions were heard together on January 30, 1997, and were taken under submission. On February 5, 1997, the trial court issued its ruling, denying SCI's JNOV and new trial motions, granting in part SCI's motion to tax costs, and granting the District's motion for attorney fees and costs, except as to those costs that were taxed. After taxing costs, the net award to the District for its attorney fees and costs was $605,422.81. This appeal followed.

## II. DISCUSSION

### A. *Motion for Summary Judgment/Judgment on the Pleadings*

On the second day of trial, SCI filed a motion for summary judgment/judgment on the pleadings. In that motion, SCI argued that because the District had filed a dismissal *with prejudice* of its cross-complaint,[2] it could no longer assert any affirmative defenses in SCI's action. If the District could not assert any affirmative defenses at trial, then a trial was unnecessary and a simple hearing to prove up SCI's damages was all that was required.

SCI based its motion on a similar holding in *Torrey Pines Bank* v. *Superior Court* (1989) 216 Cal.App.3d 813 [265 Cal.Rptr. 217]. In that case, a bank filed suit against a guarantor who failed to pay on a guaranty after the debtor

---

[2]The District initially mailed a dismissal *without prejudice* to the court for filing. SCI's defense counsel objected, however, explaining that the dismissal had to be *with prejudice* so that the District could never again come after SCI for affirmative relief. The District acceded to this request and signed a second dismissal, this one with prejudice. The dismissal with prejudice was filed by the court on October 10, 1996; the dismissal without prejudice was filed the following day.

defaulted on its loan. The guarantor filed a separate action against the bank, alleging misrepresentation, negligence and breach of fiduciary duty. Later, the guarantor dismissed his action with prejudice, reasoning that he could argue his misrepresentation claims as an affirmative defense in the bank's action against him. In a split decision, the *Torrey Pines Bank* court disagreed. When the guarantor dismissed his separate action with prejudice, the majority held, he lost his right to assert his affirmative defenses[3] in the main action. Those affirmative defenses, which contained the same nucleus of operative facts and raised the same legal issues as those alleged in the separate action, were barred under principles of res judicata. Accordingly, the *Torrey Pines Bank* court issued a writ of mandate directing the trial court to enter summary judgment in favor of the bank and against the guarantor.

In the instant action, SCI argued that the same rule should apply: The District's dismissal with prejudice of its cross-complaint should not only operate as a common law retraxit (precluding the District from filing a new action based on the same facts) but should also bar the District from asserting any of its affirmative defenses in the main action. SCI argued that, like the bank in *Torrey Pines Bank*, it was entitled to summary judgment and to prove up its damages on a default basis.

The District opposed SCI's motion for summary judgment/judgment on the pleadings principally by asking the court, in complete derogation of *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455-456 [20 Cal.Rptr. 321, 369 P.2d 937],[4] to disregard the *Torrey Pines Bank* opinion. The District argued that *Torrey Pines Bank* was poorly reasoned and claimed it was "not binding on this Court" because it was "decided by the Fourth District Court of Appeal." The District suggested that the trial court instead adopt the reasoning of Justice Huffman in his *Torrey Pines Bank* dissent.[5] Alternatively, the District argued that the summary judgment motion was

---

[3]"An 'affirmative defense' is one which 'sets forth facts from which it results that, notwithstanding the truth of the allegations of the complaint, no cause of action existed in the plaintiff at the time the action was brought.' " (*Salazar* v. *Maradeaga* (1992) 10 Cal.App.4th Supp. 1, 5 [12 Cal.Rptr.2d 676], quoting *Goddard* v. *Fulton* (1863) 21 Cal. 430, 436.)

[4]*Auto Equity* states the rule that under the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. (*Auto Equity Sales, Inc.* v. *Superior Court, supra*, 57 Cal.2d at pp. 455-456.) The trial court was well aware of this rule, reprimanding the District's counsel at the hearing on the motion, "Your argument, that I am not bound by the 4th District, I'm sorry. That is a famous case. It is called *Auto Equity Sale[s]*."

[5]The District's reliance on Justice Huffman's dissent is misplaced. His dissent criticized the majority for applying the rule in a case where the guarantor had dismissed his complaint without any consideration whatsoever. The instant case, where the District received consideration for dismissing its cross-complaint with prejudice both from SCI's bonding company and SCI's insurer is therefore inapposite.

untimely and the motion for judgment on the pleadings was barred by the statute of limitations.

Along with its memorandum of points and authorities in opposition to SCI's motion, the District also filed a motion of its own—for Code of Civil Procedure section 473 relief from the dismissal with prejudice.[6] In that motion, the District's counsel explained that the settlement was intended only to resolve the District's affirmative claims against SCI; it was never intended as a waiver of the District's affirmative defenses in the action brought by SCI. The District asked the court to withdraw the dismissal with prejudice and substitute some sort of hybrid dismissal that would preclude the District from seeking affirmative relief from SCI but that would not preclude the District from presenting affirmative defenses in SCI's action.

A hearing on both motions (SCI's motion for summary judgment/judgment on the pleadings and the District's motion for § 473 relief) was held, out of the presence of the jury, on the sixth day of trial. The trial court extensively questioned the District's counsel on the circumstances leading up to the settlement and the District's dismissal of its cross-complaint with prejudice. Counsel explained that neither he nor SCI's counsel were aware of the *Torrey Pines Bank* case, and that they had negotiated on the understanding that the District would be precluded from seeking any affirmative relief but would not be prohibited from asserting affirmative defenses in the main action. SCI called as a witness John Riddle, SCI's attorney on the cross-complaint,[7] who testified as to SCI's expectations in negotiating the settlement. Riddle was asked "why you needed a dismissal with prejudice, what that meant to you, that dismissal with prejudice." He answered, "It meant certainty of the termination of the affirmative relief sought in the terms by Mr. Moore [the District's counsel] in the monies from SCI." The settlement, he explained, was "that Mission would not seek any affirmative money damages from SCI, nor admission, use any settlement as an affirmative action against SCI. . . . [¶] That means that there would be no right or intent on the part of Mission College to seek any affirmative dollars from Sergio Construction. . . . [¶] It was our primary and only concern to make sure Sergio Construction, Inc. had no affirmative relief that could be secured against it in the form of money damages or a judgment against them."

On November 15, 1996, the 13th day of trial, the court issued its ruling on the motions. The court stated: "The court is satisfied that the defendant,

---

[6] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

[7] CNA, SCI's insurer, agreed to defend and indemnify SCI on the District's cross-complaint. Accordingly, SCI's defense counsel in the cross-action was a different individual from its retained counsel in the main action.

Mission, never intended to adjudicate its affirmative defenses in this case in the settlement of its cross-complaint against Sergio and its surety. Nor did the attorney defending Sergio on the cross-complaint bargain for affirmative defenses in this case. [¶] These findings may or may not affect this case. [¶] So far Sergio has endeavored to prove that it had a contract with Mission, that it performed the contract, and that it did all of the things required of it under the contract. That it was not itself in breach of the contract and, finally, that Mission breached the contract causing Sergio money. [¶] Mission has primarily endeavored to prove that Sergio has not performed, that Sergio breached its contract. That, in any event, Sergio suffered no damages attributable to any breach by Mission. [¶] Unless there are new developments in the case, it now appears that no affirmative defenses will be implicated. If I understand *Torrey Pines* and *Royb[a]l* [*Roybal* v. *University Ford* (1989) 207 Cal.App.3d 1080 [255 Cal.Rptr. 469]], they both affirmed the strong policy against separating the cause of action. *Royb[a]l* is not precisely applicable in that it should be read to preclude the filing of this second action after the dismissal with prejudice of an earlier identical action, albeit in a separate court, in that case, the Municipal Court. [¶] *Torrey Pines* is an effort also from the Fourth District Court of Appeal, appears to extend the reach of the policy of res judicata to the point where it is likely that White, the guarantor, who cross-complained against the bank would not have settled his case or, at least, dismissed it had he thought he was adjudicating his interest under the guarantee. [¶] The court acknowledges that it is bound by the Fourth District case . . . . [¶] Here, the proof is exclusively concerned with contract performance, particularly, an alleged failure of the owner, Mission, to provide plans and specifications free of conflict, particularly, concerning the west wall height framing, anchor-bolt placement and vapor-barrier installation under the hardwood gym floor, and the delay and cost to the contractor caused by the owner's breach of its duty under the contract to issue change orders and grant extensions of time. [¶] Out of an excess of caution the court will grant Mission's application for relief under section 473. . . . [¶] The motion for judgment on the pleadings is denied insofar as it claims that any factual or legal matter raised in the cross-complaint was necessarily adjudicated by the dismissal with prejudice. [¶] In my belief an unreasonable and unworkable extension of the *Torrey Pines* rule, if rule it be. I, however, take under submission the motion to preclude Mission's affirmative defenses in that the court is not currently informed of any that are actually being asserted. When, as and if there is proof offered in connection with the true affirmative defense, I will take up the question of whether or not it was precluded by the dismissal with prejudice of the cross-complaint, for I actually believe that the termination of a lawsuit and the circumstances of the termination of the lawsuit, particularly, as it was judicially supervised may make a direct inquiry into that

more important than the kind of treatment that the court gave to the affirmative defense in *Torrey Pines*."

On appeal, SCI contends the trial court erred in denying its motion for judgment on the pleadings. "The dismissal with prejudice," SCI asserts, "acted as a final judgment adverse to [the District]'s claims that SCI breached the contract or owed [the District] damages for breach"; therefore "SCI was entitled to prove up its damages on a default basis." As we shall explain, we disagree.

To be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff. (See, e.g., *McDonald* v. *John P. Scripps Newspaper* (1989) 210 Cal.App.3d 100, 104 [257 Cal.Rptr. 473]; *FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367 [282 Cal.Rptr. 508].)

The filing of a general denial denies in one sentence all the allegations of the complaint. (*FPI Development, Inc.* v. *Nakashima, supra*, 231 Cal.App.3d at p. 383; 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 986, pp. 444-445.) In the case of a complaint for breach of contract, a general denial denies that there is a contract, that the plaintiff performed or had an excuse for nonperformance, that the defendant did not perform, or that the plaintiff was damaged. A general denial allows the denying party the opportunity to present evidence to refute the allegations in the complaint.

In the instant case, the District, in answer to SCI's complaint, filed a general denial denying each and every allegation in the complaint. In addition, it asserted 35 affirmative defenses. The *Torrey Pines Bank* opinion did not preclude a party who dismisses his or her action with prejudice from contesting the allegations in the plaintiff's complaint. Rather, that opinion held that a party who dismisses his or her lawsuit with prejudice may not assert affirmative defenses *in the nature of new matter* where those affirmative defenses concern the same nucleus of operative facts as were alleged in the dismissed action.

The trial court below was able to ferret out this critical distinction. It specifically "rul[ed] as a matter of law that the statement by the defense that [SCI] didn't perform is not an affirmative defense. It is not. It is simply meeting the plain attempt to establish your case. That is not an affirmative

defense. [¶] If that is all that is going to happen, I don't think we have a problem."

This court agrees. ■ In *State Farm Mut. Auto. Ins. Co.* v. *Superior Court* (1991) 228 Cal.App.3d 721 [279 Cal.Rptr. 116], the court explicated the difference between denials (also known as traverses) and affirmative defenses (also known as new matters). The court stated, "Under Code of Civil Procedure section 431.30, subdivision (b)(2), the answer to a complaint must include '[a] statement of any new matter constituting a defense.' The phrase 'new matter' refers to something relied on by a defendant *which is not put in issue by the plaintiff.* [Citation.] Thus, where matters are not responsive to essential allegations of the complaint, they must be raised in the answer as 'new matter.' [Citation.] Where, however, *the answer sets forth facts showing some essential allegation of the complaint is not true, such facts are not 'new matter,' but only a traverse.* [Citation.]" (*Id.* at p. 725, italics added.)

An even clearer explanation of the difference between denials and affirmative defenses was set forth 70 years ago by Professor Pomeroy in his treatise: " 'Any facts which tend to disprove some one of these allegations may be given in evidence under the denial; any fact which does not thus directly tend to disprove some one or more of these allegations cannot be given in evidence under the denial. It follows, that if such fact is in itself a defense, or, in combination with others, aids in establishing a defense, this defense must be based upon the assumption, that, so far as it is concerned, all the material allegations made by the plaintiff are either admitted or proven to be true. The facts which constitute or aid in constituting such a defense are "new matter" . . . . The new matter of the codes admits that all the material allegations of the complaint or petition are true, and consists of facts not alleged therein which destroy the right of action, and defeat a recovery. To sum up these conclusions, . . . [*a*]*ll facts which directly tend to disprove any one or more of these averments may be offered under the general denial: all facts which do not thus directly tend to disprove some one or more of these averments, but tend to establish a defense independently of them, cannot be offered under the denial; they are new matter, and must be specially pleaded.*' " (*FPI Development, Inc.* v. *Nakashima, supra,* 231 Cal.App.3d at p. 383, fn. 4, quoting Pomeroy, Code Remedies (5th ed. 1929) § 549, pp. 900-901, original italics omitted, italics added.)

Mindful of these distinctions, we now reexamine the *Torrey Pines Bank* case. The bank's action against the guarantor required it to plead and prove the following elements: (1) the guarantor guaranteed payment of a third

party's indebtedness to the bank; (2) the third party defaulted on its loans to the bank; (3) the bank notified the guarantor of the default and demanded payment; and (4) the guarantor did not make payment to the bank. (*Torrey Pines Bank* v. *Superior Court, supra*, 216 Cal.App.3d at p. 816.) A general denial would allow the guarantor to put evidence on any or all of the following: (1) that he did not guarantee payment of a third party's debt to the bank; (2) that the third party did not default on its loan; (3) that the bank did not demand payment; and (4) that he did not fail to make the requisite payments to the bank. This evidence could properly be presented in order to disprove allegations that the plaintiff bank made in its complaint.

In *Torrey Pines Bank*, however, the guarantor did not deny the allegations in the bank's complaint. Rather, he attempted to establish a defense independent of those allegations by asserting affirmative defenses, which brought "new matter" into the lawsuit. In the guarantor's separate action against the bank, he alleged that his guaranty was procured by the bank by negligent and intentional misrepresentation. This was "new matter" that was not brought into controversy by the plaintiff's allegations.

In the instant case, in contrast to *Torrey Pines Bank*, the District was not attempting to bring up any new matter. It was merely presenting evidence to refute the allegations in SCI's complaint, which had been put into controversy by the District's general denial. Therefore the trial court was correct when it ruled "that the statement by the defense that [SCI] didn't perform is not an affirmative defense. It is not. It is simply meeting the plain attempt to establish your case." We find no error.

The trial court was convinced that the District could defend against the allegations in SCI's complaint, notwithstanding the *Torrey Pines Bank* opinion. Nevertheless, in an abundance of caution, the court stated that it would grant the District's motion for section 473 relief if that were necessary to allow the District to refute SCI's claims. SCI contends that this cautionary ruling was in error, arguing, "[t]he court did not have jurisdiction under section 473 to set aside a voluntary dismissal"; "[a]n attorney for a party has no standing to rescind their settlement"; "[w]ithout restoring the [] consideration for the dismissal, [the District]'s efforts to modify it unjustly enriched [the District]"; and "[a] dismissal with or without prejudice, when supported by consideration, carries a retraxit."

All of these arguments are predicated on the premise that SCI was prejudiced as a result of the trial court's setting aside of a dismissal with prejudice and substituting in its stead a dismissal that precluded affirmative

relief but did not preclude affirmative defenses. As we have explained, however, this premise is incorrect. The District was not allowed to argue new matters (affirmative defenses) below. Rather, it was allowed to defend against the allegations in SCI's complaint, pursuant to its general denial.[8] The conditional granting of the section 473 motion for relief, even if it was erroneous, does not warrant a reversal of the judgment because it did not have any effect on the evidence the District was permitted to present to rebut the allegations in plaintiff's complaint. We find no reversible error.

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 20, 1999.

---

[8]For example, in SCI's third amended complaint, it alleged in paragraph 15 that the District breached the contract by (1) "repeatedly issuing orders for changes to the work without formalizing said changes as a change order"; (2) approving the architect's "continuing evaluation of the performance of [SCI]"; (3) "issuing directions and changes without the express consent of the owner in the form of Architectural Supplemental Instructions and correspondence which were not authorized contract documents"; (4) ignoring over 100 requests for change orders"; (5) failing to grant "reasonable request[s] for time extensions"; (6) requiring extra work without compensation; (7) failing to identify endangered species in the construction area; (8) failing to "make timely progress payments"; (9) failing to take prompt action on "contract submittals"; and (10) failing "to provide proper interpretations and clarifications necessary for the performance of the contract." SCI alleged in paragraph 16 that it had performed all conditions, covenants and promises required of it except those that the District waived, and it alleged in paragraph 17 that it suffered proximately caused damages in excess of $1 million.

The District's general denial denied each and every one of these allegations. For example, it denied that the District breached the contract by "repeatedly issuing orders for changes to the work without formalizing said changes as a change order"; it denied that the District breached the contract by approving the architect's "continuing evaluation of the performance of [SCI]"; it denied that the District breached the contract by "issuing directions and changes without the express consent of the owner in the form of Architectural Supplemental Instructions and correspondence which were not authorized contract documents," and so forth. It further denied that SCI performed its obligations under the contract or that SCI was damaged. None of these denials brings "new matter" into the controversy; all of these issues were raised by SCI.

*See footnote, *ante*, page 1532.