Filed 7/17/13  Jasmine Networks v. Marvell Semiconductor CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JASMINE NETWORKS, INC., | H036684 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV801411) |
| v. | |
| MARVELL SEMICONDUCTOR, INC., | |
| Defendant and Respondent. | |

Appellant Jasmine Networks, Inc. (Jasmine) appeals from a judgment entered after a jury verdict in favor of respondent Marvell Semiconductor, Inc. (Marvell).  Jasmine sued Marvell on three primary claims:  misappropriation of trade secrets, breach of contract and the implied covenant of good faith and fair dealing, and intentional interference with contractual relations.  After a trial, a jury returned a verdict in favor of Marvell on all of Jasmine's causes of action.  On appeal, Jasmine argues that the trial court erred in denying its motion for a judgment notwithstanding the verdict (JNOV) because Marvell utilized Jasmine's trade secrets as a matter of law when it discussed potential liability for using Jasmine's trade secrets in a recorded voicemail.  Second, Jasmine argues that the jury's verdict should be reversed because the trial court incorrectly failed to give preclusive effect to Marvell's voluntary dismissal of its cross-complaint with prejudice.

We find that the trial court did not err in denying Jasmine's motion for a new trial as the motion was primarily based on a legal theory not tried before the jury and premised

upon disputed facts. Furthermore, we find that Jasmine's theory that Marvell's voicemail constituted "use" of a trade secret is without merit. Additionally, we determine that Marvell's evidence of Jasmine's alleged wrongdoing in the development of JSLIP was not barred under the doctrine of res judicata, and that the trial court did not err in declining to grant Jasmine's pretrial motion in limine to exclude the evidence. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

Jasmine and Marvell are both technology companies with a focus on developing semiconductor chips. Jasmine represented that it had developed a packet switch fabric. A packet switch fabric is a code used in an Internet router that directs the flow of information packets. There are two components to a packet switch fabric, a switch and a scheduler. A switch directs incoming information to an outgoing link. A scheduler determines what sequence each packet of information will be delivered so that the information packets do not "collide," rendering the information corrupt. A scheduler is vitally important to a router, as the efficiency of the scheduler ultimately impacts the router speed. Jasmine's scheduler was named JSLIP.[1]

### *The Development of Jasmine's JSLIP Scheduler*

Prior to the development of JSLIP, Dr. Nicholas McKeown developed a scheduler called ISLIP, which was patented by the Regents of the University of California as McKeown developed the code as a Ph.D. student at the University of California, Berkeley. Also prior to the development of JSLIP, McKeown developed a scheduler called ESLIP while working at Cisco, another technology company, which Cisco then

---

[1] The record contains various iterations of the term "JSLIP." Some parts of the record indicate that the code is spelled J-Slip, and others indicate that it is JSLIP. For clarity, we will hereafter refer to the code as JSLIP.

patented.[2] Cisco obtained a license from the Regents of the University of California for ISLIP, because though the company owned a patent on ESLIP, using ESLIP would invoke ISLIP technology. McKeown is now a professor at Stanford University.

Jasmine engineer Patrick Murphy and a friend, Doug Chang, a graduate student at Stanford University, discussed methods to obtain the ESLIP and ISLIP codes when Murphy was developing JSLIP. After some time, Chang and Murphy decided that Murphy could download the code off of a Stanford University computer, so Murphy visited the Stanford campus one weekend, accessed a computer, and downloaded the ISLIP code. Murphy may have also received some sort of information about McKeown's other scheduler, ESLIP.[3]

McKeown's testimony at trial confirmed that there were documents about ISLIP that were freely available on the Internet, including code. However, as McKeown described, the free availability of the code on the Internet was "different from giving someone permission to use it." McKeown further elaborated that "[i]t's well-known to any professional engineer that you would need to go and get a license for any patented material before you would use it."

Jasmine's JSLIP code essentially incorporated ESLIP and ISLIP, which was altered by Jasmine engineers to omit any reference to McKeown's programs. Murphy testified at trial that he sent e-mails to certain Jasmine developers instructing them to delete references to ISLIP and ESLIP. In one e-mail, Murphy told another Jasmine

---

[2] Like JSLIP, there are various spellings of ISLIP and ESLIP in the record. For clarity, we will hereafter refer to the code as ISLIP and ESLIP.

[3] During trial, Murphy testified that he only downloaded ISLIP code, which is publicly available on the Internet. Nevertheless, Murphy sent an e-mail to Jasmine executives after his trip to Stanford, in which he stated that he had made changes to ESLIP. When asked about if he also took ESLIP code during the Stanford trip, Murphy answered that he only had ISLIP, which was licensable, and that he never possessed the ESLIP code. Murphy stated that ESLIP was not available on the Stanford server, and that he did not know why he wrote the e-mail referencing ESLIP.

employee to go through the code and change the module names from what McKeown used in his original codes to something else. Murphy wrote, "If we don't do this it will be very easy for anyone to see that all we've done is copy McKeown's papers verbatim. [¶] Sorry for all the recommendations, but this document will be see[n] by [whomever] we partner with, and we need to make sure it's different to some degree."

### *The Deal Between Jasmine and Marvell*

In March 2001, Jasmine approached Marvell about a possible business deal, as Marvell was interested in acquiring some of Jasmine's intellectual property and assets, including its packet switch fabric technology. The parties signed a nondisclosure agreement on April 12, 2001. The nondisclosure agreement included a clause that Marvell would not "use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between [Jasmine] and Marvell." During discussions regarding Jasmine's packet switch fabric technology, Marvell questioned Jasmine about the similarity of their technology with ESLIP. In one exchange, Marvell asked: "How different is your multicast implementation [from ESLIP]?" Jasmine answered: "We don't know since [ESLIP] is not very well documented. Only two paragraphs exist that explain how it's supposed to work."

Sometime in May 2001, Marvell's focus shifted from developing a business relationship with Jasmine to acquiring the entirety of Jasmine's application-specific integrated circuit (ASIC) division including the related intellectual property and the associated Jasmine employees. The Jasmine technology specifically at interest to Marvell included the packet switch fabric technology, including JSLIP, as well as a chip called a SONET (synchronized optical network) framer.[4]

---

[4] The SONET chip processes data, and was originally designed to process voice data. Jasmine's SONET chip was different as it concentrated on taking not only voice data, but large quantities of data from over the Internet.

Marvell made an initial offer to purchase Jasmine for $30 million in cash, with a $10 million guarantee flowing from Jasmine to Marvell for nonrecurring engineering charges, and a $10 million earn-out, with an estimated $20 million in stock options provided to certain Jasmine engineers. A letter was sent to Virginia Wei, senior director of legal and business affairs at Jasmine, indicating that this initial offer was preliminarily made without Marvell's completion of its due diligence and was therefore not binding. Marvell's letter further instructed Jasmine not to solicit additional offers from competitors at that time.

Later, Marvell lowered its bid for Jasmine's ASIC division to $25 million after the initial offer, and after Jasmine unsuccessfully attempted to market itself to other companies for a competing bid.

### The Voicemail

Jasmine and Marvell proceeded with negotiations regarding Marvell's acquisition. Marvell replaced Manuel Alba, originally in charge of the business deal, with Kaushik Banerjee, head of Marvell's own ASIC division, on August 15, 2001. Alba sent Banerjee a series of e-mails that detailed the ongoing business discussions, including due diligence issues between Jasmine and Marvell. The e-mails contained the signed nondisclosure agreement between Jasmine and Marvell. Nonetheless, Banerjee did not see the e-mail with the signed nondisclosure agreement, and became concerned that the two companies may have inadvertently shared trade secrets and other confidential information without some sort of arrangement.

Banerjee met with several other Marvell employees, including Eric Janofsky, Marvell's patent counsel, and Matthew Gloss, Janofsky's supervisor and Marvell's general counsel. All three Marvell employees, Gloss, Janofsky, and Banerjee, gathered together and Gloss called Jasmine executive Virginia Wei. Gloss left Wei a voicemail in which he raised certain issues about Marvell and Jasmine's business negotiations. However, Gloss did not end the call correctly when he finished leaving the voicemail

5

intended for Wei, and without his knowledge the voicemail system continued to record a conversation between himself, Janofsky, and Banerjee that was presumably intended to be private.

In the voicemail, the three Marvell employees discussed possible repercussions, including civil and criminal penalties, if they incorporated some of Jasmine's trade secrets into their technology. No specifics of any trade secrets were discussed in the voicemail, and the voicemail did not give a clear indication of what trade secrets the Marvell employees were discussing as part of their hypothetical situation.

The relevant part of the voicemail is as follows:

"[Gloss]: Yeah, but you know the problem is so if they're dumping it into Tigo now, that's a problem.[5]

"[Janofsky]: Well, no it . . . .

"[Banerjee]: But we don't know that for a fact.

"[Janofsky]: One, at least it's not a criminal problem. I, you know . . . .

"[Banerjee]: Well, we don't know that for a fact though, but we . . . .

"[Janofsky]: No, if they gave it to us it is not a criminal problem.

"[Gloss]: Yeah, but what did we induce, what did we solicit, what did we promise, what did we say . . . .

"[Janofsky]: I don't think--it doesn't look--Sehat doesn't go to jail, obviously.

"[Gloss]: Sehat doesn't go to jail. Manuel might go to jail; Manuel gets a black eye.[6]

"[Janofsky]: I don't . . . .

_____

[5] "Tigo" references a group of products that were being produced by Marvell Israel.

[6] It is inferred from the voicemail that "Manuel" refers to Manuel Alba, the Marvell executive originally working on the business deal to acquire Jasmine. It is also inferred that "Sehat" refers to Sehat Sutardja, CEO and cofounder of Marvell.

"[Gloss]:  Sure.  Marvell VP out there promising big option grants in proposed pending acquisitions if technology is transferred in advance to speed development time so time to market goal can be reached.  That's what's going on.

"[Janofsky]:  I don't see it going to a criminal level.  I see it going to a severe civil, civil layer, but not . . . .

"[Gloss]:  But still hits, would still hit the financial.

"[Banerjee]:  But it would be okay if we pay them and we close the deal, right?

"[Janofsky]:  Once the deal closes, it's fine, but if they realize what they're doing they could hold out for more.  Use it as leverage, use it as blackmail.

"[Banerjee]:  Right, but we don't want to talk about it.

"[Janofsky]:  No, we don't want to talk about it . . . .  But my concern twenty minutes ago was keeping Sehat out of jail.

"[Gloss]:  Right.

"[Janofsky]:  That was my concern.

"[Gloss]:  Ok.

"[Janofsky]:  You've alleviated that concern.  I have other concerns, but Sehat in jail would not be a very nice thing.

"[Banerjee]:  But Sehat is going to jail because he got a . . . ?

"[Gloss]:  CEO . . . Command responsibility.

"[Janofsky]:  CEO.  If we took that IP on the pretense of just evaluating it, and put it in our product . . . .

"[Banerjee]:  But we don't know that part.

"[Janofsky]:  But they gave it to us, you know.  We don't know.  But it sounded . . . .

"[Banerjee]:  You are making a deduction that it's gone into Tigo.

7

"[Janofsky]: No, no. I am just saying if it did, from what Matt was telling me . . . we got it. You . . . . As I said, you made this story a little clearer and I don't think it rises to the criminal level.

"[Banerjee]: Yeah I mean, all I, if you look at it you begin to say hey look it was part of technical due diligence. [¶] . . . [¶]

"[Gloss]: But, you know, I'm going to sit down with Mr. Alba and talk to him about it because it was very poorly handled; there was no coordination with us, and it was this total cowboy effort, and it has the potential to absolutely spin into something more nefarious."

After some time, another individual called Gloss on his phone, terminating the voicemail recording.

### *The Aftermath of the Voicemail*

Unsurprisingly, after Wei listened to the voicemail she grew alarmed about its contents and about Marvell's possible misuse of Jasmine's intellectual property. On August 22, 2001, Jasmine sent a letter to George Hervey, chief financial officer of Marvell. The letter disclosed to Marvell that Jasmine had discovered, through statements made by Marvell personnel, that Marvell had misappropriated Jasmine's trade secrets by incorporating Jasmine's proprietary intellectual property into Marvell's products. Jasmine stated that despite Marvell's conduct, it still wished to proceed with business negotiations and that it would like to avoid litigation. Jasmine then proposed that Marvell pay Jasmine $20 million in cash, net of any fees, in exchange for a release from Jasmine for claims of trade secret misappropriation, breach of contract, and any other civil claims arising from Marvell's alleged misconduct. Jasmine proposed that "[t]he transaction will be structured as an 'as is' asset acquisition directly from Jasmine."[7] The

---

[7] Jasmine's proposed price was $5 million higher in cash than Marvell's previous offer, which had only included $15 million in cash.

letter additionally specified that the offer would expire several days later, at 3:00 p.m. on August 24.

Marvell responded to Jasmine's accusations on August 24, 2001. In a letter, Marvell denied Jasmine's accusation of misappropriation by Marvell employees. Unequivocally, the letter asserted that "[Marvell has] not and will not incorporate any of Jasmine's proprietary information into any of Marvell's products without an appropriate agreement between our two companies permitting such activity." Marvell further denied violating the signed nondisclosure agreement, and offered Jasmine "immediate and reasonable access" to Marvell's facilities and employees to corroborate its assertion. Marvell rejected Jasmine's offer, and urged Jasmine to initiate contact before August 27, 2001, if it still wished to continue discussions over the acquisition of Jasmine's ASIC division. Marvell further assured Jasmine that if discussions were not initiated, it would return all of Jasmine's confidential information in accordance with the nondisclosure agreement.

Jasmine contacted Marvell on August 28, 2001, seeking to proceed with the deal on the "old economic terms." However, due to declining market conditions, Marvell concluded that it could no longer proceed with the acquisition of Jasmine's ASIC group, and ceased discussions. Marvell sent a letter to Jasmine dated August 31, 2001, and attached a "Certificate of Destruction and Return of Confidential Information." Marvell certified that it had, through due inquiry and diligence, returned all the confidential information it held from Jasmine within its possession as listed on a schedule attached to the certificate. Marvell asserted that the items listed on the schedule were all of the confidential information received from Jasmine pursuant to the nondisclosure agreement, and that it had destroyed and deleted all of the tangible confidential information from Marvell's manual files and nonelectronic storage, which was not otherwise returned to Jasmine with the letter. The certificate further asserted that Marvell had destroyed all intangible and electronic files containing the confidential information received pursuant

9

to the nondisclosure agreement. Despite the representations in the certificate, Marvell attorney Janofsky retained some of the confidential information with the company's legal team.

### Jasmine's Bankruptcy

In 2001, Jasmine discovered that several of its ASIC group employees were allegedly conspiring to leave the company and to start their own business called "CoolComm." In a typed business strategy, Jasmine employees, including Murphy, indicated that they would create this company as an exclusive consulting business for Marvell, developing ASIC chips. Based on the business plan, Marvell would pay the employees' salaries and indemnify them against lawsuits brought by Jasmine. CoolComm never became a viable company of its own, and Jasmine employees never followed through with the business strategy. It was unclear whether or not Marvell executives possessed knowledge of this business plan, as fellow Jasmine engineer Richard Sowell testified at trial that though Murphy presented him with the typed business plan, Sowell rejected the idea and told Murphy not to pursue it any further. Sowell stated on the record that to his knowledge, Murphy did not follow through with pursuing the business plan.

In mid September of 2001, Jasmine terminated the members of its ASIC group. Jasmine declared bankruptcy in 2002, and thereafter sold its remaining assets, including its technology and intellectual property, to Teradiant Networks for $300,000.

### PROCEDURAL BACKGROUND

### The Complaint and Cross-complaint

On September 12, 2001, Jasmine filed a complaint against Marvell and several of its former employees in its ASIC division, including JSLIP designer Patrick Murphy. The complaint alleged that Jasmine had discovered a "conspiracy between many of its trusted employees and Marvell Semiconductor, Inc." to steal one of Jasmine's trade secrets and to undermine the multi-million dollar sale deal. The complaint cited to the

10

inadvertent voicemail left by Gloss, Janofsky, and Banerjee as evidence of Marvell's alleged wrongdoing. Jasmine sought relief under 11 causes of action including misappropriation of trade secrets in violation of the Uniform Trade Secrets Act (UTSA), Civil Code sections 3426 through 3426.11, against all defendants, breach of fiduciary duty against Jasmine employees Richard Sowell and Murphy, breach of contract against all defendants, and breach of the implied covenant of good faith and fair dealing against all defendants.

On December 28, 2001, Marvell filed an application for a preliminary injunction, seeking to enjoin Jasmine from disclosing the contents of the recorded voicemail. Marvell characterized the voicemail as containing privileged attorney-client communications between Marvell and its attorneys. Marvell also requested that the trial court seal the privileged communications, and strike all portions of the first amended complaint referring to the privileged communications. The trial court granted the preliminary injunction the same day, and also granted Marvell's motion to strike.[8] Jasmine filed a second amended complaint on January 11, 2002. Marvell answered on February 15, 2002, with a general denial. The answer also raised numerous affirmative defenses, including the defense of unclean hands.[9]

---

[8] Jasmine appealed the trial court's order granting the preliminary injunction barring Jasmine from using the contents of the voicemail in its complaint. On appeal, this court reversed the trial court's injunction, finding that any attorney-client communication between Marvell and its attorneys were waived, and that regardless, Jasmine had sufficiently shown a prima facie case of fraud that fit within the crime-fraud exception of the attorney-client privilege. (*Jasmine Networks*, *Inc. v. Marvell Semiconductor*, *Inc.* (2004) H023991, previously published at 117 Cal.App.4th 794.) The opinion in this case was depublished after the California Supreme Court granted review on July 21, 2004. (*Ibid.*) The Supreme Court later dismissed review. (*Jasmine Networks*, *Inc. v. Marvell Semiconductor*, *Inc.* (2008) S124914.)

[9] "The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." (*Kendall-Jackson* (continued)

11

In addition to its answer, Marvell filed a cross-complaint. The cross-complaint stated causes of action for fraud, fraudulent concealment, breach of contract, breach of the implied covenant of good faith and fair dealing. With respect to the cause of action for fraud, Marvell alleged that Jasmine employees, including Murphy, falsely and fraudulently represented to Marvell that Jasmine had developed a propriety program called JSLIP. Marvell asserted that Jasmine did not develop JSLIP independently, and that in fact Jasmine misappropriated the JSLIP program by taking information from McKeown's patented ESLIP and ISLIP programs. Marvell further alleged that Jasmine breached its contract to Marvell by failing to abide by the terms of the nondisclosure agreement, as Jasmine refused to return Marvell's confidential information including some of Marvell's intellectual property. Jasmine denied all of the allegations in the cross-complaint.

Prior to the commencement of the jury trial, Marvell sought to dismiss Jasmine's complaint on the basis that Jasmine forfeited its standing to pursue its claims of trade secret misappropriation when it sold all rights to its trade secrets and all of its other intellectual properties when it declared bankruptcy. (*Jasmine Networks*, *Inc. v. Superior Court* (2009) 180 Cal.App.4th 980, 986.) The trial court granted Marvell's dismissal of Jasmine's complaint, and Jasmine appealed. (*Ibid.*) This court issued a writ of mandate directing the trial court to reverse its dismissal and to reinstate Jasmine's causes of action after finding that there was no "current ownership" rule when it came to trade secrets. (*Id.* at pp. 986, 1010-1011.)

_____

*Winery*, *Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978.) Marvell raised the doctrine of unclean hands as an affirmative defense in its answer to Jasmine's complaint. Toward the end of the jury trial, Marvell requested the instruction be given to the jury, but the trial court denied the motion and exercised its discretion not to have this equitable defense submitted to the jury. Accordingly, no verdict was given as to whether or not Jasmine had "unclean hands."

12

### *Marvell's Dismissal of Cross-complaint and Jasmine's Motion in Limine*

Marvell dismissed its cross-complaint for fraud and fraudulent concealment with prejudice on September 22, 2010.  On September 27, 2010, Jasmine filed a motion in limine to exclude evidence of Jasmine's alleged wrongdoing in its development of JSLIP.  Jasmine argued that under the doctrine of res judicata, once Marvell dismissed its cross-complaint with prejudice, it was barred from litigating any of the claims it made in its cross-complaint in the current action.  This included any arguments and evidence Marvell sought to introduce as part of its affirmative defenses.  In its motion, Jasmine relied upon *Torrey Pines Bank v. Superior Court* (1989) 216 Cal.App.3d 813 (*Torrey Pines Bank*) and our court's decision in *Walsh v. West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532 (*Walsh*), for the proposition that the dismissal with prejudice terminated all offensive claims and affirmative defenses against Jasmine that Marvell advanced in its cross-complaint.  Marvell opposed the motion and argued that Jasmine's alleged fraud specifically negated several essential elements of Jasmine's claims, including that Jasmine owned the trade secret, that the trade secret had economic value, and that Jasmine suffered damages as a result of Marvell's alleged misappropriation.  Therefore, Marvell argued that any evidence of fraud and fraudulent concealment supported its general denial, not its affirmative defenses.

The trial court agreed with Marvell, stating that "I think it is [Jasmine's] burden to show that the plaintiff owned a trade secret; two, that the trade secrets have independent economic value; that the theft or compromise of the trade secrets caused the plaintiff economic damages. [¶] All of this evidence about [JSLIP], [ESLIP], you know, who created it, who owns it[,] I think is relevant to show ownership, value, damages, and so I understand plaintiff's arguments, but I think this is a traverse, and I think it goes to the general denial."  The trial court thereafter distinguished the case from *Torrey Pines Bank*, and denied Jasmine's motion in limine.

13

### The Trial and Verdict

Trial lasted approximately five weeks, from September 30, 2010, to November 9, 2010, when the jury began its deliberations. At trial, Jasmine argued that Marvell wrongfully misappropriated Jasmine's trade secrets, harming Jasmine in the process. According to Jasmine's trial brief, one of the main trade secrets at issue that Marvell allegedly misappropriated was its RTL code. "RTL" stands for "register transfer language," which is a general description for "any computer coding utilized to test the functionality of computer hardware," such as Jasmine's ASIC chips. Jasmine argued that its creation of the verified RTL code represented a real advance in the science of computer networking, and was something that possessed tremendous value. Jasmine did not list JSLIP as one of its trade secrets, but did admit that without JSLIP some of its technology, including its packet switch fabric, would not function.

Notably, Jasmine's trial brief never argued that the voicemail left for Wei amounted to "use" of its trade secrets under the UTSA, but simply that the voicemail was evidence of improper acquisition, and further suggested improper use of Jasmine's trade secrets. A Jasmine expert testified at trial that the damages incurred by Jasmine was in the amount of approximately $25 million. Jasmine also argued that Marvell violated the terms of the parties' nondisclosure agreement when its employees failed to completely destroy all traces of Jasmine's confidential information. Several Marvell employees testified that Marvell retained copies of certain documents provided by Jasmine with Marvell's legal department in anticipation of a possible litigation.

Marvell rejected these arguments at trial, and asserted that deteriorating market conditions, not Marvell's alleged misappropriation of trade secrets, was the cause of Jasmine's eventual bankruptcy and downfall. Further, Marvell maintained that the voicemail at issue was not harmful to Jasmine, as it simply involved several Marvell employees discussing hypothetical situations regarding use of Jasmine's trade secrets. Additionally, Marvell presented evidence that Jasmine could not have suffered any harm

14

because it did not develop the JSLIP scheduler itself, since the company fraudulently and deceptively used McKeown's ESLIP and ISLIP programs as the backbone of its own JSLIP scheduler.

The trial concluded on November 9, 2010, and the jury returned a verdict after approximately two weeks of deliberation. With regards to Jasmine's first cause of action for misappropriation of its trade secrets, the jury found that Jasmine did own certain architectural design specifications used to implement its ASIC chip set, and that these were trade secrets. The jury, however, found that Marvell did not improperly acquire or use the trade secret.

With regards to Jasmine's second cause of action for breach of contract, the jury found that Jasmine did not comply with all of the significant aspects of the nondisclosure agreement, and that Jasmine was not excused from having to comply with the nondisclosure agreement. The jury similarly found, on Jasmine's claim of breach of implied covenant of good faith and fair dealing, that Jasmine failed to comply with all the significant aspects of the nondisclosure agreement. The jury did not reach the issue of whether Marvell failed to comply with all the significant portions of the nondisclosure agreement for any of these two claims.

As for Jasmine's claim of intentional interference with a contractual relationship, the jury found that there was a contractual relationship between Jasmine and its ASIC employees, that Marvell knew of this contractual relationship, but that it did not intend to disrupt the performance of the contract. The trial court entered a judgment for Marvell pursuant to the jury's verdict on January 7, 2011.

### *The Posttrial Motions*

Jasmine filed a motion for a partial JNOV on January 20, 2011, pursuant to Code of Civil Procedure section 629. Jasmine argued that if a jury's verdict is incorrect as a matter of law, the trial court must enter a JNOV in favor of the aggrieved party. (*Oakland Raiders v. Oakland-Alameda County Coliseum*, *Inc.* (2006) 144 Cal.App.4th

15

1175, 1194.)  In part, Jasmine argued that the voicemail left by Gloss, Banerjee, and Janofsky itself "constituted a misuse of Jasmine's Misappropriated Trade Secrets." Jasmine also argued that because Marvell dismissed its cross-complaint with prejudice, evidence of Jasmine's alleged fraud should never have been admitted, and accordingly substantial evidence did not support some of the jury's special verdict findings.

Jasmine filed a concurrent motion for a new trial on January 20, 2011.  The motion for new trial asserted that Jasmine was entitled to a new trial because the jury's special verdict answers were inconsistent, that the trial court committed reversible error by denying Jasmine's earlier motion in limine to exclude evidence about the allegedly fraudulent development of its JSLIP scheduler, and that Marvell's repeated allegations that Jasmine engaged in fraudulent activity deprived Jasmine of a fair trial.

Marvell opposed both of these posttrial motions.  In its opposition to the motion for a JNOV, Marvell argued that Jasmine was raising, for the first time in the motion for JNOV, that Marvell's voicemail in itself "used" Jasmine's trade secrets.

On March 3, 2011, the trial court denied both of Jasmine's motions.  On March 14, 2011, Jasmine filed a timely notice of appeal over the judgment entered on January 7, 2011 and the trial court's order denying its motion for JNOV on March 3, 2011.

## DISCUSSION

Jasmine pursues two main arguments on appeal.  First, Jasmine argues that it is entitled to a partial JNOV because the voicemail left by Marvell employees by itself constituted a misappropriation of its trade secrets.  Second, Jasmine contends that the judgment must be reversed because the trial court erred in failing to give Marvell's dismissal with prejudice of its cross-complaint the preclusive effect that was required, which therefore allowed Marvell to erroneously introduce evidence of the allegedly fraudulent development of Jasmine's JSLIP scheduler, resulting in prejudicial error against Jasmine.

16

For reasons that we will explain below, we find that neither of Jasmine's arguments have merit.  We address both of Jasmine's principle contentions in turn.

### 1.  *JNOV*

First, Jasmine argues the trial court erred in denying its motion for a JNOV on the basis that the voicemail left for Jasmine executive Wei constituted a misappropriation of trade secrets.  In short, Jasmine's first argument hinges on this court's determination of whether or not the voicemail constituted "misappropriation" or "use" of Jasmine's trade secrets in violation of the UTSA.  According to Jasmine, *any* unauthorized use of trade secrets is a misappropriation, including transmittal of the voicemail, and accordingly the jury's findings that there was no misappropriation cannot be reconciled with the law.  However, we find that Jasmine waived this novel argument on appeal, as this contention is premised on a new theory of misappropriation that was not presented to the jury or the trial court below, and was raised for the first time in posttrial motions.  Furthermore, even if we were to entertain Jasmine's arguments on the merits, we find that simply referring to a trade secret in a conversation, without discussing any specifics of the trade secret or employing the trade secret in some manner, is not a "misappropriation" or "use" of the trade secret under the UTSA.

**Standard of Review**

On appeal, we review the trial court's denial of a motion for a JNOV and examine if substantial evidence supports the original verdict.  (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  A motion for a JNOV can only be granted by a court if, after reviewing the evidence in the light most favorable to the prevailing party, there is no substantial evidence to support the verdict.  (*Ibid.*)

**Overview of the UTSA**

Before we turn to the merits of Jasmine's claim, we first briefly overview the UTSA, which sets forth guidelines on what constitutes misappropriation or improper use of a trade secret.  The UTSA is located in the Civil Code, sections 3426 through 3426.11,

17

and allows plaintiffs to recover damages for improper use or misappropriation of trade secrets that they own. (Civ. Code, § 3426.3.) Civil Code section 3426.1 provides a definition of a trade secret, and specifies that a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (*Id*. § 3426.1, subd. (d).)

"A trade secret is misappropriated if a person (1) acquires a trade secret knowing or having reason to know that the trade secret has been acquired by 'improper means,' (2) discloses or uses a trade secret the person has acquired by 'improper means' or in violation of a nondisclosure obligation, (3) discloses or uses a trade secret the person knew or should have known was derived from another who had acquired it by improper means or who had a nondisclosure obligation or (4) discloses or uses a trade secret after learning that it is a trade secret but before a material change of position. (Civ. Code, § 3426.1, subd. (b).)" (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 66 (*Ajaxo*).)

In sum, under the UTSA, in order to sufficiently state a cause of action of trade secret misappropriation, the plaintiff must demonstrate three essential elements (1) it owned a trade secret of economic value, (2) that the defendant in question somehow acquired, used, or disclosed the plaintiff's trade secret through improper means as described above, and (3) there was resulting harm. (*CytoDyn of New Mexico*, *Inc. v. Amerimmune Pharmaceuticals*, *Inc.* (2008) 160 Cal.App.4th 288, 297.)

The UTSA does not define "use," but rather "leaves their delineation to be adjudicated in light of the purposes and other provisions of the act." (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 222 (*Silvaco*), disapproved of on another ground in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337.) "As it

18

appears in the act, the noun 'use' is surely intended in the ordinary sense, i.e., '[t]he act of *employing* a thing for any (esp. a profitable) purpose; the fact, state, or condition of being so employed; *utilization* or employment for or with some aim or purpose, *application or conversion* to some (esp. good or useful) end.'  (19 Oxford English Dict. [(2d ed. 1989)] p. 350, italics added.)"  (*Silvaco*, *supra*, at p. 223.)  Accordingly, a trade secret is "used" when it is exploited for an advantage, such as if a company takes a written computer code and incorporates it into its own program or product.  (*Id.* at p. 224.)

### *Forfeiture of Claim*

Preliminarily, Marvell contends that Jasmine forfeited its argument that the voicemail constituted "use" of a trade secret because it did not raise this specific argument below before the trial court.  The theory Jasmine presented to the jury was that the voicemail *suggested* that misappropriation took place, not that the voicemail itself was misappropriation, and that Marvell breached the nondisclosure agreement when it failed to destroy all documents related to Jasmine's trade secrets since it retained copies of some information with its attorneys.  It is Jasmine's position that because this new argument rests "*solely* on the irrefutable fact that Marvell left the voicemail" (italics added), it therefore presents as a question of law based on undisputed facts that this court should consider despite the failure to raise the argument below.  However, Marvell contends that this new theory is actually premised on three disputed facts:  that Marvell knew the trade secrets, that the voicemail was likely to result in injury, and that the voicemail discussion violated the nondisclosure agreement between the two companies.

On appeal, a litigant "may not change his or her position" and "assert a new theory."  (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316.)  The reason behind this rationale is that doing so would be unfair to both the trial court and the opposing party, as the opposing party would have no opportunity to present contrary arguments below to the trial court and jury.  (*Ibid.*)  However, as the reviewing court, we retain the discretion to consider new theories on appeal if the theory is a matter of law that simply requires

19

application to undisputed facts.[10]  (*Ibid.*)  We agree with Marvell's argument that Jasmine's new theory of misappropriation is based on disputed facts that were not resolved by the jury.

From the face of Jasmine's arguments, it appears that it is their contention that the voicemail itself constituted "use" of Jasmine's trade secrets.  Jasmine argues that since the existence of the voicemail is an undisputed fact, whether or not the voicemail's existence therefore constitutes "use" is a question of law applied to undisputed facts. Jasmine further contends that Marvell need not have possessed actual knowledge of the trade secrets for it to "use" Jasmine's trade secrets, and so it is of no relevance if Marvell's possession of the trade secrets was a disputed fact.  Jasmine argues that what matters is that the voicemail "clearly *presumed* that Marvell had Jasmine's secrets."  In Jasmine's own words, whether or not the participants in the voicemail actually knew of the trade secrets in question has no direct bearing on the issue at hand.

However, any "use" of a trade secret does not necessarily amount to misappropriation.  A person only misappropriates a trade secret if the disclosure or use was improper, such as if the use violates a nondisclosure agreement.  (*Ajaxo*, *supra*, 135 Cal.App.4th at p. 66.)  To that end, Jasmine contends that Marvell's use of the trade secrets was improper because it violated the terms of the companies' nondisclosure agreement, which specifies that Marvell will not "use any Confidential Information for any purpose except to evaluate and engage in discussions concerning a potential business relationship between [Jasmine] and Marvell."  Accordingly, Jasmine infers that the contents of the voicemail indisputedly violated the terms of the nondisclosure agreement,

---

[10] Jasmine did raise this issue in its posttrial motion to the court for a JNOV and a motion for a new trial, but similarly, new theories may not be presented before the trial court for the first time on posttrial motions unless it is also a theory based on a question of law premised on undisputed facts.  (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653-1654.)

as Marvell did not use the trade secrets for the purpose of discussing a potential business relationship with Jasmine. Marvell argues that whether or not the voicemail constituted a violation of the nondisclosure agreement is actually a disputed factual issue that they were not able to present below. We agree.

Here, Jasmine and Marvell argued before the jury about whether or not Marvell violated the nondisclosure agreement when it failed to destroy all scintilla of confidential information provided by Jasmine. Marvell employees testified at trial that it retained some of the confidential information and turned it over to Marvell attorneys. Jasmine's theory before the jury was that Marvell's failure to destroy all documents constituted a violation of the nondisclosure agreement. However, the jury never reached a verdict on whether or not Marvell violated the nondisclosure agreement, as it found that Jasmine failed to fully comply with the nondisclosure agreement itself.[11] Jasmine never asserted that Marvell's voicemail discussion regarding the trade secret itself constituted a violation of the nondisclosure agreement, and in fact has raised this theory, like its theory that the voicemail "used" trade secrets under the UTSA, for the first time on appeal. It is a disputed fact which Jasmine's theory relies upon.[12]

---

[11] The jury's special verdict form contained a series of questions divided into different sections that tracked Jasmine's claims against Marvell. Section II, titled "As to Jasmine's cause of action for breach of contract against Marvell," asked: "8. Did Jasmine do all, or substantially all, of the significant things that the contract, known as the NDA, required it to do?" The jury put a checkmark next to "no." The next question read, "9. Was Jasmine excused from having to do all, or substantially all, of the significant things that the NDA required it to do?" The jury put a checkmark next to "no," and was therefore instructed via the jury form to proceed to section III, skipping over the question of whether or not Marvell partook in any activity that may be a violation of the nondisclosure agreement.

[12] Marvell also argued that whether or not it actually possessed Jasmine's trade secret was also a disputed fact. However, we determined that whether or not the voicemail violated the nondisclosure agreement signed by Jasmine and Marvell is a disputed fact. Accordingly, it is not necessary for us to address whether or not Marvell's
(continued)

We therefore find that Jasmine's new theory of misappropriation relies on disputed facts, and is therefore not properly raised for the first time on appeal. Additionally, even if we were to consider this argument on the merits, we find that Jasmine's argument that the voicemail itself constituted an inappropriate "use" of its trade secrets fails on the merits.

### *Discussing a Trade Secret Is Not "Use" in this Context*

As discussed *ante*, the UTSA does not explicitly define "use," though case law has interpreted "use" as the incorporation or dissemination of trade secrets for a defendant's own advantage, such as taking the trade secret and applying it to the defendant's own products or services for the defendant's own advantage. (*Silvaco*, *supra*, 184 Cal.App.4th at pp. 222-224.) Jasmine argues that "use" under the UTSA should actually be even more broadly defined, such that Marvell's voicemail discussion of Jasmine's technology would constitute a "use." We decline to apply such a broad definition.

In part, Jasmine relies on *Syngenta Crop Protection*, *Inc. v. Helliker* (2006) 138 Cal.App.4th 1135 (*Syngenta*), and argues that the holding in *Syngenta* is applicable in showing that a passive use of a trade secret still violates the UTSA. However, Jasmine's reliance on *Syngenta* is misleading, as *Syngenta* is distinguishable on several grounds. Syngenta was a company that invented metalaxyl, which was used as a pesticide product. (*Id.* at pp. 1146-1147.) Syngenta registered the product with the United States Environmental Protection Agency (EPA) and the state Department of Pesticide Regulation (Department). (*Ibid.*) With its registration, Syngenta also submitted studies and other information on the chemistry, health effects, and environmental impact of the substance as required under law. (*Ibid.*) Syngenta stopped manufacturing metalaxyl and informed the Department that it would not authorize the consideration of any of the data

---

possession of the trade secrets was also a disputed fact that was not properly raised in front of the jury.

it previously submitted to support a product registration by another applicant. (*Ibid.*) Gustafson, another company, also manufactured pesticide products that contained metalaxyl and applied for registration with the Department. (*Ibid.*) In its registration materials, Gustafson did not refer the Department to any of the previously-submitted Syngenta studies, nor did it reference any of the previously submitted research. (*Ibid.*) In a similar situation, Dow, another pesticide company, also invented a substance which it submitted for registration with the Department, along with accompanying reports and studies. (*Id.* at p. 1147.)

Syngenta sued Gustafson and the Department, and Dow sued the Department, in part alleging that the Department misappropriated trade secrets when it considered past data submitted by Syngenta and Dow in support of the new product registrations. (*Syngenta*, *supra*, 138 Cal.App.4th at pp. 1148-1150.) All parties eventually moved for summary judgment, and the trial court sustained summary judgment for Syngenta on one cause of action, but sustained summary judgment for the Department and Gustafson on the remaining causes of action including the cause of action for violation of the UTSA, finding that the Department's " 'passive consideration' " of the previously submitted data did not constitute "use." (*Id.* at p. 1150.) The appellate court held that this finding by the trial court was in error, as the Department "used" data when it considered any of Syngenta and Dow's previously submitted information. (*Id.* at p. 1172.) Once the Department considers the previously submitted data, it relieves the current applicant-- such as Gustafson--of the need to spend money to produce data results thereby benefitting the new applicant. (*Ibid.*)

Jasmine is correct in asserting that the term "use" under the UTSA has been broadly defined, as illustrated by the court's interpretation in *Syngenta*. "Use" may certainly encompass many applications of a trade secret, including passive consideration of data. Furthermore, "[e]mploying the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or

23

soliciting customers through the use of trade secret information, all constitute use." (*PMC*, *Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1383.) Federal courts have also determined that "internal experimentation with trade secret information not resulting in a market product can constitute use." (*02 Micro Intern. Ltd. v. Monolithic Power Systems* (N.D.Cal. 2005) 399 F.Supp.2d 1064, 1072.)

Nonetheless, Jasmine's current theory is dissimilar to the passive consideration of trade secrets employed by the Department in *Syngenta*. A passive consideration in violation of the UTSA would, under *Syngenta*, be properly illustrated as "using" the data by considering it without proper permission, thereby relieving a second company of the responsibility of providing the same data, to the second company's economic benefit. (*Syngenta*, *supra*, 138 Cal.App.4th at p. 1172.) Here, Jasmine's theory is *not* that Marvell passively considered Jasmine's trade secrets when it developed its own technology. Rather, Jasmine argues that passive consideration or use of a trade secret occurs when someone merely references a trade secret in a conversation.

Jasmine's definition of "use" cannot stand under the UTSA. We cannot find law directly on point that specifically discusses or analyzes the situation we have before us. In short, there is no specific law that has developed that clearly holds that an internal discussion of whether or not one company's use of another company's trade secret would constitute a "use" of a trade secret in of itself. However, in considering the case we have before us on the merits, we cannot read the UTSA in such a way that such conversations alone would constitute a misappropriation. Here, Janofsky and Gloss engaged in a conversation with their client, Banerjee, a Marvell employee, about a hypothetical situation about the potential legal implications of using Jasmine's trade secrets. No specifics of Jasmine's trade secrets were discussed in the voicemail, only that Jasmine possessed trade secrets which Marvell may have misappropriated. The voicemail itself, as Jasmine argued below to the jury, tends to suggest that Marvell *may* have misappropriated and used Jasmine's trade secrets in violation of the UTSA. The

24

voicemail itself is not a "use," nor can it be. A discussion, in generic terms, of a company possessing a trade secret, and a hypothetical discussion of the possible ramifications against a company's executives if a trade secret is somehow misappropriated, is not "use" as contemplated by the UTSA.

An illustration of such a limitation can be found in the recently decided federal district case, *Brocade Communications Systems Inc. v. A10 Networks*, *Inc.* (N.D. Cal. Feb. 12, 2013) __ F.Supp. __ [2013 WL 557102; 2013 U.S. Dist. LEXIS 18870] (*Brocade*). In *Brocade*, the federal district court contemplated the legality of an injunction imposed against A10 prohibiting the company from further misappropriating Brocade's trade secrets after a jury found A10 liable for misappropriation. (*Id.* at p. *1.) A10 moved to modify portions of the injunction, which the trial court granted in part. (*Ibid.*) As it stood, the injunction as drafted would have prohibited A10's attorneys from utilizing the trade secrets during the course of the litigation before the trial court and throughout the pendency of a future appeal. (*Id.* at p. *9.) A10 argued that this portion of the injunction should be modified so that its attorneys would be allowed to have access to the trade secrets during the course of the litigation, which Brocade conceded. (*Ibid.*) However, A10 further argued that its attorneys should have ongoing access to Brocade's trade secrets while A10 modified its technology to design and remove the misappropriated trade secrets. (*Ibid.*) Brocade disagreed, arguing that *any* advice given to A10 by attorneys with knowledge of Brocade's trade secrets would be using the trade secrets in violation of the UTSA. (*Ibid.*) The district court agreed with A10, finding that "use" under the UTSA did not extend to include an attorney advising its clients on how to *avoid* practicing the trade secrets. (*Ibid.*)

While we are not bound by the decision of the district court, we find its reasoning persuasive. In this instance, the voicemail left by Marvell indicated that Marvell attorneys were speculating as to the potential penalties to be imposed if the company was found to have misappropriated Jasmine's trade secrets. Like the attorneys' contemplated

25

actions in *Brocade* (advising its clients on how to avoid using a trade secret), Marvell's attorneys were advising and discussing the potential ramifications against Marvell executives if it *did* use the trade secret. Extending the UTSA to prohibit an attorney, even an attorney with knowledge of the trade secret, from contemplating the potential legal consequences for misappropriating a trade secret, would frustrate an attorney's ability to serve and advise his or her clients.

The UTSA does not protect the amorphous concept of a "trade secret." Most technology companies possess some sort of intellectual property or trade secret not commonly known to the public, which is the backbone of the company's profitability and economic viability. Therefore, the fact that Jasmine possessed some sort of trade secret is an assumption that can be readily made. It follows that a generic conversation about the potential misuse of some sort of trade secret, without going into specifics of the trade secret, does not expose the listener to any confidential information, and more importantly does not "use" the information as contemplated by the UTSA. In short, the UTSA does not prevent misappropriation by prohibiting one company from discussing, in general terms, the fact that another company has a trade secret. The UTSA protects a company's *specific* trade secret from misuse. In the factual situation presented before us, we find Jasmine's theory that the voicemail itself constituted a misappropriation of its trade secrets flawed.

Further, Jasmine's argument that the voicemail's contents soured the relationship between the two parties, thereby costing Jasmine the economic benefit of a possible acquisition by Marvell, is similarly flawed. Certainly, the misunderstanding that occurred as a result of the voicemail likely imparted a negative impact on the burgeoning business relationship between the two companies. However, as Jasmine aptly characterized the voicemail in its trial brief, the voicemail by itself only provided evidence, or an inference, that some of Jasmine's trade secrets may have been misappropriated. It is possible that the voicemail caused economic harm because it

26

created panic and distrust between the two companies, but this harm was not incurred as a result of a misappropriation of trade secrets.

As a result, we find that Jasmine's argument that the voicemail itself constituted a misappropriation of its trade secrets would fail on the merits, even if Jasmine had not forfeited the argument on appeal for failing to raise it below. We therefore find no error with the trial court's denial of Jasmine's motion for a JNOV.

### 2. *Marvell's Dismissal of its Cross-complaint and Retraxit*

Jasmine's second main argument on appeal is that Marvell's dismissal of its cross-complaint with prejudice should have precluded the admission of any related evidence or claims previously raised in the dismissed cross-complaint. Jasmine argues that the trial court incorrectly denied its motion in limine to exclude all such evidence, and accordingly the jury trial was improperly tainted with erroneous evidence. Preliminarily, Marvell argues that Jasmine is precluded from raising this objection on appeal because it forfeited it below by failing to make specific objections to any of the evidence of Jasmine's wrongdoing presented to the trial court and to the jury. We find merit to Marvell's argument regarding forfeiture, and further find that even if we consider Jasmine's contentions on the merits, they would fail.

### A. *Standard of Review*

Jasmine's argument that the dismissal of the cross-complaint constituted a retraxit and therefore acted as a bar against inclusion of any fraud-related evidence is based upon undisputed facts. Accordingly, we review Jasmine's argument de novo. (See *Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319, 1326 (*Alpha*).)

### B. *Failure to Make Specific Objections to the Evidence*

As previously described, Jasmine made a pretrial motion in limine to exclude all evidence of wrongdoing stemming from Marvell's dismissed cross-complaint. Thisincluded evidence of Jasmine's allegedly fraudulent development of JSLIP. No

specific evidence, such as a particular testimony or exhibit, was referenced in Jasmine's motion in limine. In support of its pretrial motion, Jasmine argued that retraxit barred admission of the evidence, which is the same argument it makes now on appeal.[13] Marvell preliminarily contends that this argument is forfeited because Jasmine failed to make specific objections to the evidence introduced below. We agree.

Evidence Code section 353 states that a judgment or decision shall not be reversed due to an erroneous admission of evidence unless there is a clear record of a timely objection or a motion to exclude or to strike the evidence, and if the reviewing court determines that it was error to admit the evidence and the error resulted in a miscarriage of justice. A motion in limine to exclude evidence can satisfy the requirements of Evidence Code section 353 if "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context. When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*People v. Morris* (1991) 53 Cal.3d 152, 190 (*Morris*), disapproved of on another ground by *People v. Stansbury* (1995) 9 Cal.4th 824, 830.) Ordinarily, a ruling on a motion in limine is not binding on a trial court, as it may reconsider its ruling when the objectionable evidence is offered. (*People v. Karis* (1988) 46 Cal.3d 612, 634, fn. 16.) A

---

[13] Jasmine's opening brief on appeal and its posttrial motion before the trial court discussed at length how Marvell's dismissal of its cross-complaint with prejudice amounted to a retraxit, which therefore invoked the doctrine of res judicata, barring relitigation of any of the claims previously contained in the cross-complaint. A "retraxit" is what is now more commonly known as a dismissal with prejudice. (*Torrey Pines Bank*, *supra*, 216 Cal.App.3d at p. 820.)

failure to object to the challenged evidence at the time it is offered normally constitutes a waiver unless it satisfies the requirements described by *Morris.*

The requirement at issue here is whether or not Jasmine's motion in limine was specific enough to preserve its objections on appeal, despite the lack of reference to any specific testimony or exhibit.  As *Morris* described, under Evidence Code section 353, those contesting the admissibility of evidence must make an objection to a specific body of evidence, such as a particular testimony or exhibit.  For example, in *Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202 (*Karlsson*), the Second District determined that Ford's unsuccessful motion in limine to prevent admission of evidence of its alleged discovery abuses did not properly preserve the objection for appellate review.  (*Id.* at pp. 1227-1228.)  In *Karlsson*, Ford filed its motion in limine seeking to exclude evidence of its discovery abuses *prior* to any sanctions being filed, and prior to the filing of the discovery report that led to sanctions.  For obvious reasons, Ford's motion in limine failed to reference specific passages or identify any particular comments to be excluded, as Ford had no knowledge of what kind of evidence would be produced at the time the motion was filed.  (*Ibid.*)  Accordingly, the court of appeal deemed Ford's objections waived, as the motion in limine was not sufficient under Evidence Code section 353. (*Ibid.*)

Similarly, in *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), the California Supreme Court considered a case where a criminal defendant made a pretrial blanket motion to bar " 'any and all' postmortem photographs" of the victims in the case.  (*Id.* at p. 476.)  The defendant sought to exclude the evidence under Evidence Code section 352, which is subject to the same requirements of a specific objection to maintain appealability under Evidence Code section 353.[14]  In *Cowan*, the trial court overruled the

---

[14] Evidence Code section 352 allows a court to exercise its discretion to exclude any evidence if the probative value of the evidence is substantially outweighed by the (continued)

defendant's preliminary motion to exclude all photographs of the victims on the basis of relevance, as the trial had not yet begun and therefore the court could not determine if all photographs would be irrelevant. (*Cowan*, *supra*, at p. 476.) However, in its ruling the court left open the possibility that upon a later objection, it would reconsider its ruling and exclude certain photographs from admission. (*Ibid.*) Later, the photographs were admitted, and defendant failed to object. (*Ibid.*) The Supreme Court thereafter determined that defendant forfeited his contentions on appeal because of his failure to object to the photographs when they were admitted. (*Ibid.*)

These cases illustrate that a blanket motion in limine seeking to exclude all types of evidence, including a motion in limine to exclude all evidence in a specific category, such as evidence of alleged discovery violations, or all postmortem photographs of victims, is not specific enough to satisfy Evidence Code section 353. (*Morris*, *supra*, 53 Cal.3d at p. 190.) The motions made by the parties in *Karlsson* and *Cowan* identified a category of evidence to be excluded, but failed to identify a particular and identifiable body of evidence. We find the decision in *Karlsson* persuasive, and further find that the situation contemplated by the court in *Karlsson* similar to the one presented here. Jasmine, in its motion in limine before the trial court, did not specify exactly what evidence it sought to exclude, and only in broad strokes informed the court of its desire to exclude any evidence of its alleged fraud or wrongdoing in the development of JSLIP. Again, no particular, identifiable body of evidence was described in the motion in limine.

Undoubtedly, since the motion was filed before commencement of the actual jury trial began, Jasmine might not have known what kind of evidence would be presented at trial, and under what context Marvell would seek to introduce evidence. Nonetheless,

---

probability that its admission would produce undue prejudice or mislead the jury, or if the probative value is substantially outweighed by the probability that admission of the evidence would be unduly time consuming.

that is why motions in limine do not *always* preserve an objection to the admission of evidence on appeal. In order to preserve this objection on appeal, Jasmine would have had to voice its objection to the specific evidence it sought to exclude during trial, which it failed to do.

Jasmine argues that it did not forfeit its retraxit-related arguments here on appeal because after the trial court denied its motion in limine it was futile for it to pursue objections at trial. It is true that a party need not object when doing so would be futile. (See *People v. Arias* (1996) 13 Cal.4th 92, 159; *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1433, fn. 1.) In this case, we do not find it unequivocal that an objection at trial would have been futile. A trial court may reconsider its ruling on a motion in limine during the course of the trial. (*People v. Karis*, *supra*, 46 Cal.3d at p. 634, fn. 16.) Though the court made it clear that it believed that evidence of fraud and fraudulent concealment in the development of JSLIP was admissible on the basis that such evidence supported Marvell's general denial and not its affirmative defenses, it did not make a ruling on each a specific body of evidence presented in a particular context at trial.

In part, Jasmine relies on our decision in *Burch v. Gombos* (2000) 82 Cal.App.4th 352 (*Burch*), for its argument that an objection would have been futile and thus no objection was necessary to preserve the argument on appeal. *Burch* is not wholly applicable to the present case. In *Burch*, the appellant contended the trial court erred in permitting the respondents from introducing evidence of a disputed roadway's public use because respondents had previously responded to a request for evidence regarding the same issue by admitting they had no evidence of a public use. (*Id.* at p. 355.) Prior to the commencement of the trial, appellants filed a motion in limine with the trial court arguing for exclusion of all evidence of recreational use of the disputed roadway prior to 1972. (*Id.* at p. 357.) During trial, a witness testified to recreational use of the roadway prior to 1972, though appellant failed to object. (*Ibid.*) Another witness testified to another

recreational use of the roadway, and appellant raised an objection and asked that her motion in limine be addressed. (*Ibid.*) The trial court denied the motion in limine. (*Ibid.*) At that point, this court surmised that "[w]hile [appellant] did not specifically object to any of this testimony, her motion in limine had already been denied and it obviously would have been futile to do so." (*Ibid.*)

Jasmine claims that this case stands for the proposition that if a motion in limine is denied, a party to an action need not raise futile evidentiary objections in order to preserve appellate review. In the interest of judicial economy, it seems a fair rule that *if* raising an objection after a failed motion in limine is futile, further objections need not be raised before the trial court. Nonetheless, as *Cowan* and *Karlsson* illustrate, a denial of a motion in limine does not necessarily render a future objection futile. In certain circumstances, as discussed in *Burch*, a denial of a motion in limine definitively indicates that all future objections will be futile. However, this is not always the case. In a similar argument to Jasmine's present contention in *Karlsson*, Ford argued that it was excused from making any objections before the trial court because the trial court made it clear that the opposing party could discuss Ford's concealment of evidence, and because the comments made by the trial court denying Ford's posttrial motions for a new trial and JNOV indicated that the court would have overruled any objections. (*Karlsson*, *supra*, 140 Cal.App.4th at p. 1229.) The appellate court determined that the statements Ford cited did not render the company excused from making timely objections. (*Ibid.*)

Like the appellate court's determination in *Karlsson*, we find that Jasmine was not excused from making an objection on the basis that doing so would have been futile. Furthermore, we find that factually, *Burch* is dissimilar. First, the *Burch* appellant did in fact object to *some* of the specific pieces of contested evidence. Second, the *Burch* trial court denied the motion in limine unequivocally to allow admission of all disputed evidence. In contrast, here, Jasmine did not specifically point out what type of evidence it sought to exclude, be it testimony or exhibits. Jasmine's trial counsel even stated

32

before the trial court's ruling on its motion in limine that it would reserve its objections for specific pieces of evidence for the actual trial itself. In arguing for the trial court's grant of its motion in limine, Jasmine's trial counsel remarked that "[w]e are asking you to rule that they can't introduce evidence to prove that we're frauds or, you know, are guilty of unclean hands. Now, we're not asking--we'll *save our objections as the evidence is proffered*, but the reason I filed this today was I was concerned about [Marvell's] opening statement." (Italics added.) Marvell asserts, and Jasmine does not dispute, that Jasmine never raised a specific objection to any of the theft/fraud evidence it sought to exclude under its motion in limine.

The trial court also did not make it unequivocally clear that raising a future objection to the evidence would be futile, only that it would deny the motion in limine insomuch as it believed such evidence was coming in to support Marvell's general denial. An objection at the time the evidence was presented might have allowed the trial court to more accurately assess, given the context, whether or not the evidence was coming in to support a general denial or whether or not it was coming in to support an affirmative defense. Even now on appeal, Jasmine does not specifically identify each piece of evidence it now claims was erroneously admitted. Jasmine provides, in its brief, an overview of certain pieces of evidence it believes was erroneously admitted, but in no way does Jasmine provide an exhaustive list of all evidence it claims should have been barred.

However, even if Jasmine did not forfeit this contention by failing to object below, we determine that the trial court correctly found that evidence of Jasmine's alleged fraud was admissible as part of Marvell's general denial.

C. ***Overview of Res Judicata and Effect of Voluntary Dismissal with Prejudice***

Res judicata gives " '*conclusive effect* to a *former judgment* in a subsequent litigation involving the same controversy.' " (*Boeken v. Philip Morris USA, Inc.* (2010)

48 Cal.4th 788, 797 (*Boeken*).) The doctrine of res judicata encompasses two different forms.

First, there is claim preclusion. Claim preclusion bars a second suit between the same parties on the same cause of action. (*Boeken*, *supra*, 48 Cal.4th at p. 797.) Second, there is issue preclusion, or collateral estoppel. Collateral estoppel occurs when a prior judgment in a *different* action acts as a bar against a second suit, and applies when certain requirements are met: "(1) the issue to be precluded must be identical to that decided in the prior proceeding; (2) the issue must have been actually litigated at that time; (3) the issue must have been necessarily decided; (4) the decision in the prior proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be in privity with the party to the former proceeding." (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077.)

As our Supreme Court in *Boeken* stated, "for purposes of applying the doctrine of res judicata . . . a dismissal with prejudice is the equivalent of a final judgment on the merits, barring the entire cause of action." (*Boeken*, *supra*, 48 Cal.4th at p. 793.) "The statutory term 'with prejudice' clearly means the plaintiff's right of action is terminated and may not be revived. . . . [A] dismissal with prejudice . . . bars any future action on the same subject matter." (*Roybal v. University Ford* (1989) 207 Cal.App.3d 1080, 1086-1087.) "A retraxit arising from a dismissal with prejudice thus operates as a legal fiction, and it is given the same finality as if the matter were adjudicated and proceeded to a final judgment on the merits." (*Alpha*, *supra*, 133 Cal.App.4th at p. 1331.)

D. *Jasmine's Retraxit Argument*

On appeal, Jasmine argues that it was error for the trial court to allow Marvell to introduce, admit, or make reference to any evidence of Jasmine's alleged wrongdoing or fraudulent conduct during the development of JSLIP. Jasmine argues that since Marvell dismissed its cross-complaint for fraud with prejudice, it should have been barred from relitigating or bringing forth claims that were already brought in the cross-complaint. We

34

disagree with this view, and find that the trial court's denial of Jasmine's motion in limine was not in error.

In some instances, dismissal of a complaint with prejudice will bar a party from raising the same arguments again in a separate case under the doctrine of res judicata, or collateral estoppel. Here, Jasmine argues that the Fourth District's decision in *Torrey Pines Bank*, *supra*, 216 Cal.App.3d 813, is applicable as evidence of Jasmine's wrongdoing was improperly admitted in support for Marvell's affirmative defenses. In *Torrey Pines Bank*, the Fourth Appellate District determined that dismissing a case with prejudice effectively bars a party from asserting the same factual claims in the dismissed case in an affirmative defense. In *Torrey Pines Bank*, a guarantor dismissed with prejudice a guarantor's case against a bank for several claims, including breach of fiduciary duty and misrepresentation. (*Id.* at p. 817.) The bank had earlier filed a complaint against the guarantor in a separate action, seeking enforcement of the guarantor's continuing guaranty to the bank for a loan. (*Ibid.*) After the guarantor dismissed his action, the bank moved for summary judgment against the guarantor, arguing that the guarantor's dismissal of his action with prejudice barred him from bringing the same claims as affirmative defenses in response to the bank's complaint. (*Id.* at p. 818.) The trial court granted summary judgment on some of the bank's issues, but declined to grant summary judgment on other issues, finding that the retraxit doctrine did not bar the plaintiff's affirmative defenses. (*Ibid.*) The bank petitioned for a writ of mandate, which the Fourth Appellate District granted after finding that the guarantor's affirmative defenses *were* barred by the principles of res judicata. (*Id.* at pp. 819-820.)

In its reasoning, the appellate court noted that res judicata not only bars a renewed claim over a litigated, and resolved, issue, but also bars " 'subsequent litigation of all issues which were or could have been raised in the original suit.' " (*Torrey Pines Bank*, *supra*, 216 Cal.App.3d at p. 821.) Accordingly, a final judgment on the merits on a

35

particular issue, such as a voluntary dismissal with prejudice, would be conclusive between same parties.  (*Ibid.*)

However, this court has made an important distinction that the holding in *Torrey Pines Bank* is confined only to those cases where a party is asserting affirmative defenses based upon factual claims barred by the doctrine of retraxit.  In *Walsh*, *supra*, 66 Cal.App.4th 1532, we expressly stated that the *Torrey Pines Bank* decision held that "a party who dismisses his or her lawsuit with prejudice may not assert affirmative defenses *in the nature of new matter* where those affirmative defenses concern the same nucleus of operative facts as were alleged in the dismissed action."  (*Id.* at p. 1545.)

*Walsh* involved a suit between Sergio Construction, Inc. (SCI) and West Valley Mission Community College District (District).  (*Walsh*, *supra*, 66 Cal.App.4th at p. 1534.)  SCI contracted with the District to build a gymnasium on its college campus, a contract that was later terminated when SCI failed to complete the construction project within a year.  (*Id.* at p. 1535.)  SCI sued the District for breach of contract, and the District filed a cross-complaint against SCI.  (*Id.* at p. 1536.)  The cross-complaint was settled by SCI's insurer and its bonding company, and the District dismissed its cross-complaint with prejudice.  (*Id.* at pp. 1536-1537.)  SCI then moved for judgment on the pleadings, arguing that since the District dismissed its cross-complaint with prejudice, its dismissal acted as a retraxit which would therefore render it impossible for the District to contest SCI's claims.  (*Id.* at pp. 1537, 1541.)  The trial court denied the motion, and the case proceeded to trial with a jury returning verdict for the District, granting it attorney fees of approximately $600,000.  (*Ibid*.)  SCI appealed, and we affirmed the judgment. (*Id.* at p. 1548.)

In order for SCI to prevail on its claim of breach of contract, it would have needed to plead and prove several elements:  a contract existed, SCI performed on the contract or was excused from performance, the District breached the contract, and SCI incurred damages.  (*Walsh*, *supra*, 66 Cal.App.4th at p. 1545.)  The District filed a general denial

36

to SCI's complaint, which meant it denied, in one sentence, *all* allegations in the complaint. (*Ibid.*) SCI's argument, that the District should have been barred from presenting evidence of SCI's breach because it dismissed its cross-complaint with prejudice, was therefore flawed. As we surmised in *Walsh*, this evidence went directly towards disproving one or more of the essential elements of SCI's complaint. (*Id.* at p. 1546.) In *Walsh*, we considered and distinguished *Torrey Pines Bank*. We found that the guarantor in *Torrey Pines Bank* "did not deny the allegations in the bank's complaint. Rather, he attempted to establish a defense independent of those allegations by asserting affirmative defenses, which brought 'new matter' into the lawsuit." (*Id.* at p. 1547.) In contrast, the District did not attempt to bring "new matter" into the lawsuit, but rather presented evidence to refute the allegations brought by SCI in its complaint. (*Ibid.*)

Jasmine argues that we should reconsider our decision in *Walsh*, as our Supreme Court's more recent decision in *Boeken*, *supra*, 48 Cal.4th 788, holds that a voluntary dismissal with prejudice bars any future action on the same issue. (*Id.* at p. 793.) However, Jasmine misapplies the holding in *Boeken*. In *Boeken*, a wife filed suit against cigarette manufacturer Philip Morris for loss of consortium. In a separate case, her husband, a longtime smoker, filed suit against Philip Morris for wrongfully causing his cancer. (*Id*. at p. 792.) The wife dismissed her suit for loss of consortium with prejudice several months after filing the action, and the record remained silent on her reasons for dismissal. (*Id.* at p. 793.) A year after dismissing her loss of consortium suit, and after her husband died from cancer, the wife brought a cause of action for wrongful death against Philip Morris. (*Ibid.*) Amongst her claims was a claim that she suffered from loss of love, companionship, and comfort. (*Ibid.*) Philip Morris demurred to the wrongful death cause of action, arguing that the wife's dismissal with prejudice invoked the doctrine of res judicata, barring her new cause of action. (*Ibid.*) The trial court sustained the demurrer, and the Court of Appeal affirmed. (*Ibid.*)

The California Supreme Court affirmed the Court of Appeal's decision. (*Boeken*, *supra*, 48 Cal.4th at p. 805.) In coming to its conclusion, the court first outlined the two different forms of res judicata, claim preclusion and issue preclusion. (*Id.* at p. 797.) The *Boeken* court recognized that in their particular situation they were concerned with claim preclusion and whether or not the wife's dismissal of her first suit for loss of consortium acted as a bar against her second suit for wrongful death. (*Ibid.*) The court noted that when it came to issues of res judicata, the phrase "cause of action" has a "more precise meaning: The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced." (*Id.* at p. 798.) Accordingly, a cause of action is based on the harm suffered by the plaintiff. In the wife's case, the Supreme Court determined the primary right involved in both the loss of consortium suit and the wrongful death suit, insomuch as it sought damages for loss of companionship, was the same: the right *not* to be permanently and wrongfully deprived of her husband's companionship and affection. (*Id.* at pp. 797, 804.) Accordingly, the Supreme Court determined that the wife's second suit for wrongful death was precluded based on her dismissal with prejudice of her loss of consortium claim, despite the fact that it was based on a completely different legal theory. (*Id.* at p. 804.)

The *Boeken* court explicitly considered the issue based upon *claim preclusion*, not issue preclusion. Here, we are concerned with issue preclusion. Marvell did not attempt to relitigate its fraud and misrepresentation claims by filing a new suit or cross-claim against Jasmine. Jasmine conflates and confuses the two forms of res judicata in arguing that *Boeken* is applicable. We are not considering whether or not a second claim can be brought when a first claim has already been adjudicated conclusively. Here, we are considering whether an issue, previously brought in a cross-complaint but dismissed with prejudice, may be raised as part of a party's general denial in a separate litigation. This

38

distinguishes this case from *Boeken*, and renders Jasmine's argument on appeal similar to the parties' contentions found in *Torrey Pines Bank* and *Walsh*.

Accordingly, despite the fact that in this case some of the issues were previously raised by Marvell in its dismissed cross-complaint, the doctrine of res judicata does not necessarily bar Marvell from introducing evidence of Jasmine's alleged wrongdoing. If Marvell attempted to relitigate this issue by filing a new complaint against Jasmine alleging fraud, the claims would be barred under *claim preclusion*. Res judicata would also bar relitigation of this same claim if Marvell attempted to bring this action as an affirmative defense. (*Torrey Pines*, *supra*, 216 Cal.App.3d at p. 821.) However, under our decision in *Walsh*, *supra*, 66 Cal.App.4th at page 1545, if this evidence was brought to support Marvell's general denial, it is not "new matter" and is thus properly introduced.

The issue is thus whether or not the evidence of Jasmine's fraud and wrongdoing was correctly characterized by the trial court as part of Marvell's general denial, or if it was, as Jasmine asserts, improperly introduced as part of Marvell's affirmative defense. We find that it was properly introduced as part of Marvell's general denial.

The difference between an affirmative defense and a general denial, as explained by this court in *Walsh*, is that " '[u]nder Code of Civil Procedure section 431.30, subdivision (b)(2), the answer to a complaint must include "[a] statement of any new matter constituting a defense." The phrase "new matter" refers to something relied on by a defendant *which is not put in issue by the plaintiff*. [Citation.] Thus, where matters are not responsive to essential allegations of the complaint, they must be raised in the answer as "new matter." [Citation.] Where, however, *the answer sets forth facts showing some essential allegation of the complaint is not true*, such facts are not "new matter," but only a traverse.' " (*Walsh*, *supra*, 66 Cal.App.4th at p. 1546.)

It is true that Marvell, in its answer to Jasmine's complaint, asserted an affirmative defense of unclean hands, though the instructions for this defense were never given to the

39

jury. However, as the trial court noted in its denial of Jasmine's motion in limine, evidence of Jasmine's wrongdoing supported Marvell's general denial. As we discussed earlier, a proper cause of action for trade secret misappropriation under the UTSA must allege that the plaintiff company owned a trade secret, the defendant somehow misappropriated and used the trade secret through improper means, and there was a resulting harm to the plaintiff. (*CytoDyn of New Mexico*, *Inc. v. Amerimmune Pharmaceuticals*, *Inc.*, *supra*, 160 Cal.App.4th at p. 297.) The evidence Marvell introduced at trial concerning Jasmine's alleged wrongdoing and fraud in the development of JSLIP goes toward disproving that Jasmine possessed a trade secret of value, and that there was resulting harm to Jasmine as a result of the misappropriation. It follows that if Jasmine did not actually properly own the rights to JSLIP such that it was required to obtain a license to use the scheduler from Cisco, it would be difficult for Jasmine to prove that its trade secrets that relied upon the JSLIP scheduler had value, and that accordingly misappropriation of those trade secrets caused Jasmine harm.

Jasmine argues that this argument in part fails because it specifically excluded JSLIP as one of its listed trade secrets. However, during the trial Marvell sought to prove that many of Jasmine's trade secrets would not function without JSLIP, including the RTL code which it claimed was its most important trade secret.[15] As Marvell described before the court, proving that Jasmine did not own a trade secret that was of value would be part of its general denial against Jasmine's claim of misappropriation.

In light of the circumstances of this particular case, we therefore agree with the trial court's assessment that evidence of Jasmine's alleged fraud and wrongdoing was a vital part of Marvell's general denial, not its affirmative defense. This evidence is

---

[15] The RTL code is comprised of individually numbered software, starting from No. 1 through No. 69. Numbers 2 through 39 of the software files referenced JSLIP. Jasmine's trial counsel described the RTL code as being one of the company's most valuable trade secrets in Jasmine's trial brief.

40

inextricably linked to whether or not Jasmine actually owned trade secrets that had monetary value, and whether or not Jasmine was therefore economically harmed by the purported misappropriation.

We therefore find no merit to Jasmine's argument that the jury's verdict should be reversed, as the trial court did not err in denying the motion in limine to exclude evidence of Jasmine's alleged fraud.

**DISPOSITION**

The judgment is affirmed.  Marvell is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

 

 

_____

Premo, Acting P.J.

 

WE CONCUR:

 

_____

Elia, J.

 

_____

Márquez, J.

41